**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| DANNY WILLIAM CHERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    No. 1:15-cv-01766-SEB-TAB |
| | ) |
| CORIZON HEALTH, INC., and | ) |
| DR. LEVINE, | ) |
| Defendants. | ) |

**Entry Granting Defendants' Motion for Summary Judgment**
**and Directing Entry of Final Judgment**

For the reasons explained in this Entry, the defendants' motion for summary judgment
[dkt. 34] is **granted.**

## I.    Background

The plaintiff in this 42 U.S.C. § 1983 civil rights action is Danny Cherry ("Mr. Cherry").
The defendants are Corizon LLC (referred to as Corizon Health, Inc.) ("Corizon") and Dr. Scott
Levine ("Dr. Levine"). At all relevant times, Mr. Cherry was incarcerated at the Pendleton
Correctional Facility ("Pendleton"). He is currently confined at the New Castle Correctional
Facility.

Mr. Cherry alleges in his amended complaint, filed on December 17, 2015, that Corizon
has a policy and practice of forcing injections when it is unwarranted and it does not properly
train its medical staff at Pendleton. He also alleges that Dr. Levine ordered forced injections of
antipsychotic medication against his will because he was on a religious fast. He alleges
violations of his First and Eighth Amendment rights and breach of contract as a third-party
beneficiary.

The defendants seek resolution of Mr. Cherry's claims through the entry of summary judgment. Mr. Cherry has opposed the motion, albeit he did so four and a half months after the motion was filed and he submitted no evidentiary materials. The Court has considered Mr. Cherry's opposition. The defendants replied and the motion is ripe for resolution.

## II. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007).

## III.  Discussion

### A.  Undisputed Facts

On the basis of the pleadings and the portions of the expanded record that comply with the requirements of Rule 56(c)(1) of the *Federal Rules of Civil Procedure*, construed in a manner most favorable to Mr. Cherry as the non-moving party, the following facts are undisputed for purposes of the motion for summary judgment:

Mr. Cherry has a history of bipolar disease, depression, psychosis, and delusions. He is also HIV-positive. On April 27, 2015, he was transferred from the Marion County Jail to the Reception Diagnostic Center. On May 15, 2015, Mr. Cherry was transferred to Pendleton.

On June 9, 2015, Dr. Levine, a psychiatrist at Pendleton, conducted a chart update on Mr. Cherry's medications and mental health status. At that time, Dr. Levine recommended continuing Mr. Cherry's Celexa prescription as treatment for depression. Mr. Cherry's records

revealed that he had previously taken Geodon, an antipsychotic medication, with a May 9, 2015, stop date.

On June 30, 2015, Mr. Cherry was placed in administrative segregation for writing a threatening letter to a female guard. On July 2, 2015, he was seen by a counselor for segregation monitoring. During the encounter, Mr. Cherry presented with poor reasoning, impulse control, judgment and insight. In August 2015, Mr. Cherry refused medications and medical care including a recommended Hepatitis B vaccine and a blood draw to evaluate his HIV infection.

On September 4, 2015, Mr. Cherry saw a nurse in the facility clinic for right flank pain. His treating physician, Dr. Paul Talbot, was concerned that Mr. Cherry could be exhibiting signs of liver complications from his HIV infection, so he was sent to the emergency room at St. Vincent's Hospital for evaluation of severe acute right upper quadrant abdominal pain. At the time, it was noted that Mr. Cherry weighed 242 pounds. After a CT scan reflected no abnormalities related to his complaints of abdominal pain, Mr. Cherry was discharged from the emergency room. No further treatment was recommended and Mr. Cherry did not complain further of abdominal pain.

On September 8, 2015, a chart note entered by Susan Resch, RN, reflected that Mr. Cherry stated he was going on a hunger strike. It was also noted that Mr. Cherry had a history of suicide attempts, he had been diagnosed as bipolar, and his sister had committed suicide. Mr. Cherry was determined to be a suicide risk.

On September 8, 2015, Mr. Cherry was seen in the urgent care unit at Pendleton by staff psychologist, Dr. Roger Perry, for an initial Behavioral Health and Suicide Monitoring visit. Dr. Perry reported Mr. Cherry was anxious, agitated, and disheveled. His reasoning, judgment, and insight were poor. His attitude was hopeless and uncooperative. Mr. Cherry spoke rapidly about

inept medical care, various miscarriages of the legal system, an unfair trial, and unfair charges to his inmate account. Mr. Cherry stated he had been refusing his HIV medication because it made him sick. During the encounter, Mr. Cherry denied suicidal ideation, but talked about loneliness, hopelessness, and frustration. He stated that he might starve himself in order to meet Christ's record of fasting for forty days. His thought processes were somewhat tangential, and his thought content revealed paranoia, delusions, and phobias. Mr. Cherry was diagnosed as symptomatic for chronic bipolar disorder and depression, with exacerbation. It was noted that he had a past history of self-harm. Dr. Perry recommended that Mr. Cherry be placed in the Pendleton Hospital Restraint Unit ("HRU") in the high risk unit on close suicide observation. Dkt. 35-1, at p. 5; dkt. 35-2, at p. 323-24.

On September 10, 2015, Mr. Cherry was seen by Dr. Perry for a suicide monitoring visit. Dr. Perry reported that Mr. Cherry was uncooperative, paranoid, and appeared delusional. His thought processes were incoherent, and showed loose associations, as well as flight of ideas and perseveration. He repeated his concerns over and over again. He showed a flawed sense of logic and stated he feared government entities and representatives were out to destroy him. Mr. Cherry had refused seven meals to date, and pledged to cleanse himself so as to be worthy of sacrificing his life so things could be better for others. And though he denied suicidal ideation or intent, Mr. Cherry did not appear to understand the danger of his actions. Dkt. 35-1, at p. 5; dkt. 35-2, at pp. 307-09.

On September 10, 2015, Mr. Cherry began refusing all medical care, including refusing to be weighed, give urine samples, have his vital signs taken or blood drawn, and, at times, even to talk to medical staff. He was regularly assessed by nursing and medical staff as part of the suicide observation protocol. Dkt. 31-5, at p. 5; dkt. 35-2, at pp. 13-14, 166-306.

On September 11, 2015, Mr. Cherry was seen by Dr. Perry who reported that he continued to be unstable. He had missed ten meals but insisted he was not on a hunger strike and was instead experiencing a religious purification. Although Mr. Cherry denied suicidal ideation, he seemed unaware that his behavior of refusing all medications and meals could become life-threatening. Dkt. 35-1, at p. 5.

On September 14, 2015, Mr. Cherry was seen by Dr. Paul Talbot for an unscheduled visit in response to his continued hunger strike. Dr. Talbot noted that Mr. Cherry had been on a hunger strike for 7-8 days with 21 or more missed meals. Though Mr. Cherry had been drinking some water, a visual examination revealed that his lips and mucus membranes were dry. He refused all medical care, a nursing and medical assessment, food, vital sign check, weight check, and urine or blood tests. He would not sign refusal of treatment forms. He was informed that continued refusal of food and medical treatment could cause damage to his organs, including his brain. He was advised to eat and allow medical testing. Mr. Cherry's refusal of treatment form was signed by the physician, nurse, and officer present. Dkt. 35-1, at p. 6.

On September 15, 2015, Dr. Levine saw Mr. Cherry for a medication management visit. He noted that, in addition to his hunger strike, Mr. Cherry was now refusing hydration. Mr. Cherry was minimizing the risks of his behavior, stating "Jesus fasted for 40 days and 40 nights." He claimed his actions were in protest of multiple wrongs based on beliefs he was not being protected from assault (for which Internal Affairs found no supporting evidence), that medical was doing venipuncture in order to manipulate him, and that prison staff had stolen his legal work. Mr. Cherry acknowledged a history of psychiatric care, but he continued to refuse pharmacotherapy. During the encounter, Mr. Cherry spoke loudly, excessively, and rapidly, with flight of ideas. His reasoning, judgment, and insight were very poor. He was unable to

understand and could not agree to refrain from harmful action. Mr. Cherry exhibited signs of delusional thinking and psychosis. In the event Mr. Cherry reconsidered his refusal to take anti-psychotic medication, Dr. Levine ordered 10 mg fluphenazine tablets to be taken once daily for acute mood stabilization and psychosis. Dkt. 35-1, at pp. 6-7.

Based on multiple factors, Dr. Levine recommended that Mr. Cherry be reviewed by the Indiana Department of Correction ("IDOC") medical treatment review committee to determine whether Mr. Cherry met the criteria for involuntary treatment with medication to address his psychotic symptoms. These factors included: Dr. Levine's examination of Mr. Cherry; Dr. Levine's conference with Dr. Perry regarding Mr. Cherry's mental health condition; Dr. Levine's review of Mr. Cherry's medical records; Dr. Levine's experience in treating inmates with mental disorders; Mr. Cherry's multiple delusions; and Mr. Cherry's dramatic loss of weight due to his refusal of food and water. In Dr. Levine's medical opinion, Mr. Cherry posed a risk of serious harm to himself such that a forced administration of medication was recommended. *Id.* at p. 7.

Later on September 15, 2015, Mr. Cherry was seen again by Dr. Perry who noted that Mr. Cherry claimed he was refusing meals for a higher purpose. Mr. Cherry also was refusing water, claiming that the water from his cell was tainted. He continued to refuse psychiatric medications. *Id.*

On September 16, 2015, Mr. Cherry was seen by Dr. Perry for a suicide monitoring visit. Mr. Cherry continued to refuse behavioral health medication and exhibited delusional speech and ideation. An emergency involuntary medication hearing was scheduled for September 17, 2015. *Id.*

On the evening of September 16, 2015, Nurse Resch was able to get Mr. Cherry's weight. At the time, he weighed 189 pounds, which was a 53-pound decrease since his last measurement on September 4, 2015, only 12 days before. *Id.*

On September 17, 2015, Mr. Cherry's involuntary treatment hearing was held before the medical treatment review committee ("the committee") in accordance with IDOC Health Care Service Directive 4.10 "Involuntary Psychotropic Medication Administration." The committee was composed of Dr. Stephanie Dresher, Dr. Paul Talbot, and Jeff Ballenger (prisoner advocate from custody staff). Dkt. 35-1, at p. 8. Mr. Cherry was present for the committee hearing. He expressed his opinion that he did not need medicine. "It is a form of control. I have a religious right to fast." Dkt. 35-2, at p. 343. The committee noted that Mr. Cherry's immune system was already compromised (from his HIV infection) and that fasting and refusing water would be further detrimental to his health. The committee noted that Mr. Cherry presented with psychosis, persecutory delusions, and tangential speech, and had refused 26 meals. He had also refused water claiming he would prefer IV fluids. Mr. Cherry had experienced significant weight loss. Dr. Levine was present at the hearing and presented evidence of Mr. Cherry's mental health condition. As Dr. Levine was not a member of the committee, he did not vote on whether to approve the use of involuntary medications for Mr. Cherry. The committee unanimously approved use of psychotropic medications to attempt to stabilize Mr. Cherry's mental health condition. It found that Mr. Cherry "presents with psychosis and it is felt he can only be stabilized with involuntary medication." Dkt. 35-1, at p. 8; dkt. 35-2, at p. 343.

On September 17, 2015, Dr. Levine saw Mr. Cherry after the involuntary treatment committee hearing. He noted that Mr. Cherry had refused his 26th meal that morning, and stated that he had not been taking fluids because he believed the facility's water was harming him. Dr.

Levine noted that Mr. Cherry's judgment and insight continued to be very poor and he exhibited signs of psychosis. Based on the committee's approval of involuntary psychotropic medication, Dr. Levine ordered a series of fluphenazine decanoate (Prolixin) injections, to be administered daily for two days beginning on September 17, 2015, and again on October 17, 2015, followed by a single injection of 25 mg/mL solution to be administered once every two weeks. Dkt. 35-1, at pp. 8-9.

Later on September 17, 2015, Mr. Cherry was seen by Dr. Perry who noted that Mr. Cherry continued to be somewhat delusional and continued to refuse meals. Mr. Cherry continued to refuse water in his cell, but suggested that he could be hydrated medically through intravenous fluids. Dr. Perry noted that Mr. Cherry was on involuntary treatment status and "may not refuse" his fluphenazine injections. He determined that Mr. Cherry would continue to be observed closely through the initial injections to determine if he responded to the medications. Dkt. 35-1, at p. 9.

On September 18, 2015, Dr. Levine conducted a chart update for Mr. Cherry. Mr. Cherry continued to refuse food and hydration. Dr. Levine noted that the immediate-release fluphenazine injectable that had been prescribed for Mr. Cherry would not be available until the following Monday, so he ordered that an alternative medication Prolixin Decanoate be initiated immediately. On September 18, 2015, as ordered, Mr. Cherry was administered 0.5 ml of Prolixin Decanoate. He tolerated the injection well, though he stated that he did not want it. *Id.* at pp. 9-10.

On September 21, 2015, Mr. Cherry was seen by Dr. Perry. Mr. Cherry continued to refuse meals, asserting that he was doing so for religious reasons. He continued to show lack of insight into the overall danger of his actions. Mr. Cherry stated that he would consider eating if

he was given chicken patties. It was determined that he would continue on close observation and would be seen daily by both medical and mental health personnel. Later on the same day, Mr. Cherry ate his evening meal and voiced no complaints of discomfort. *Id.* at p. 10.

Mr. Cherry continued to be monitored on close suicide watch over the next several days. Although he continued to refuse medical treatment such as lab draws and vital sign checks, he did eat his meals. On September 25, 2015, Mr. Cherry was seen by Dr. Perry. Mr. Cherry had submitted a note in which he stated he had decided he would have to adjust to prison life and wanted to return to the general prison population. He was generally calm, cooperative, and appropriately social. He denied suicidal ideation or intent. It was noted that Mr. Cherry had received his first involuntary injection on September 18, 2015. Mr. Cherry stated he felt much better, with no racing thoughts or need to try and quell his thoughts of fasting. It was determined that he would return to the general population the following week. *Id.* at pp. 10-11.

On September 28, 2015, Mr. Cherry was seen by Dr. Perry. He denied any suicidal ideation or intent, or intent to harm himself or others. Mr. Cherry confirmed his request to be released from all suicide observation. Though Mr. Cherry's mood was anxious, his memory was intact, his attitude was cooperative, his attention was maintained, his self-perception was realistic, and his thought processes were logical. He was released from suicide watch status and returned to his assigned unit. Over the next two months, Mr. Cherry was seen regularly by mental health professionals for follow up visits and continued to receive a fluphenazine injection every two weeks. *Id.* at p. 11.

On November 16, 2015, Mr. Cherry was seen by Dr. Perry for a mandatory therapy appointment. Mr. Cherry loudly stated that he had filed a legal complaint against several mental health staff and presented Dr. Perry with an email notification of a legal complaint. (Mr. Cherry

filed the present lawsuit on November 9, 2015.) Mr. Cherry had ignored several previous mental health appointment passes and he told Dr. Perry he did not wish to be seen, but he would not sign a refusal of treatment form. During the encounter, Mr. Cherry was agitated and uncooperative. Dr. Perry determined that Mr. Cherry would be evaluated the next day in the Department Staff Meeting to determine if he should be monitored for decompensation. *Id.* at p. 12.

On November 24, 2015, Mr. Cherry was admitted to the high risk unit on a temporary mental health placement for suicide monitoring and was seen by Dr. Perry. Mr. Cherry had not honored several passes for therapy visits and was very loud and out of control. Mr. Cherry threatened to go on another hunger strike if he was forced to do anything else he did not want to do. After his placement in the HRU, Mr. Cherry was very angry and spat on his cell's window, for which he then apologized. Except for his anger, Mr. Cherry's mental status was clear. Dr. Perry determined that Mr. Cherry would be seen again later that day to determine if he had calmed sufficiently to return to his assigned housing. *Id.* at pp. 12-13.

Later that evening, Mr. Cherry was again seen by Dr. Perry. Mr. Cherry was calm and apologetic. He insisted that he was not suicidal and had no intention of self-harm. Mr. Cherry pledged to be more cooperative in the future and to follow procedures. During the encounter, Mr. Cherry's behavior and speech were appropriate. Mr. Cherry was released from his temporary mental health hold to return to his assigned unit. *Id.* at p. 13.

On November 27, 2015, Mr. Cherry was seen by Kim Simpson, RN, for cuts to his left wrist. Mr. Cherry had eight small lacerations to the inner aspect of his left wrist. The nurse cleaned and dried the wounds, stopped the bleeding with direct pressure, and covered the area with small Band-Aids. Dkt. 35-2, at pp. 103-04. Mr. Cherry stated that he had not "thought of killing himself" until he woke up and found the pass requiring that he appear in the clinic for his

forced medication injection. *Id.* at p. 104. He claimed that made him suicidal "because that's one of the side effects of that shot and I don't want it." *Id.* A call was placed to Dr. Perry and Mr. Cherry was placed on suicide watch status in the high risk unit. Mr. Cherry stated that he was "upset about the injection he was to receive" and voiced threats of suicide. *Id.* at p. 100.

After several days of observation, on November 30, 2015, Mr. Cherry was evaluated by Dr. Perry. Mr. Cherry was calm and cooperative. He denied any suicidal intent or ideations. He was released from suicide watch and cleared to return to his assigned housing. On December 7, 2015, Mr. Cherry was seen by Dr. Stephanie Drescher for a suicide monitoring post-release follow-up visit. Mr. Cherry stated he would like to be removed from involuntary medication. Dr. Drescher informed him that in order for this to happen he would need to begin complying with his treatment plan including attending his therapy appointments and avoiding self-harming behaviors. Dkt. 35-1, at p. 14.

On December 21, 2015, based on additional threats of self-harm, Mr. Cherry was returned to suicide watch in the HRU, where he remained until December 28, 2015. In January and February 2016, Mr. Cherry was placed on suicide watch several times based on reports of his depression, failure to eat, and failure to comply with his mental health treatment program. He continued to receive fluphenazine injections every two weeks. On February 1, 2016, Mr. Cherry was seen by Dr. Perry for a suicide monitoring visit at which time Dr. Perry reported that part of Mr. Cherry's behavior plan agreement with his primary therapist was that he would return to the HRU if he felt he was spiraling out of control and believed he might hurt himself. Once he was in HRU, Mr. Cherry missed several meals and indicated he was fearful of his lack of self-control and admitted that he felt better when he accepted meals. *Id.*

On March 14, 2016, Mr. Cherry was provided with a "Notice of Treatment Review Committee Hearing" regarding the recommendation that he continue to be given fluphenazine decanoate. The hearing before the IDOC treatment review committee was scheduled for March 15, 2016. Mr. Cherry was informed that he was entitled to be present at the hearing and could present evidence and request assistance in presenting his case to the committee. Mr. Cherry signed the Notice, indicating that he had been informed of the need for the hearing and that he had been advised of his rights. Dkt. 35-1, at p. 15; dkt. 35-2, at p. 354.

On March 15, 2016, the committee held a six-month review of Mr. Cherry's need for continued involuntary medication. The committee was composed of Dr. Drescher, Dr. Rippetoe, and Dr. Talbot. Dr. Levine, Dr. Bolding, Dr. Perry, and John Safford also attended the hearing. Mr. Cherry chose not to attend the hearing. The committee noted the reason for initiation of involuntary medication had been Mr. Cherry's fasting and fluid refusal. Dkt. 35-2, at p. 344. The committee also noted that Mr. Cherry felt he was being manipulated by medical staff; he suffered from delusions without medication; and his hygiene decreased significantly without medication. *Id*. The committee approved continuation of Mr. Cherry's involuntary medication because of his refusal to take medications voluntarily. Dkt. 35-1, at p. 15. The treatment summary further stated that when Mr. Cherry decompensates he puts his physical health at risk, including additional health risks due to his HIV status. Dkt. 35-2, at p. 346. The summary noted that Mr. Cherry had a history of suicide attempts and threats of self-injurious behavior including the September 2015 threats of self-harm, the November 2015 self-inflicted cuts to his wrist, and threats of self-harm in December 2015, January 2016, and February 2016. *Id.* The treatment summary also states Mr. Cherry's last suicide attempt was in 2014 and that he had a history of attempted overdose, attempted hanging, and a carbon monoxide poisoning attempt. *Id.*

Although Mr. Cherry continues to suffer from a serious mental health condition, he showed some improvement and began eating and drinking after he received anti-psychotic medication beginning in September 2015. Mr. Cherry was closely monitored while on anti-psychotic medication and continually evaluated by mental health staff. His health, including his mental condition, continues to be evaluated and monitored. Dkt. 35-1, at p. 16.

## B. Analysis

Mr. Cherry argues in his response that "everything the defendants stated in the summary judgment was lies." Dkt. 42. He has not identified any specific "lies" nor has he presented any evidence to support this broad statement. He also contends that he should not have had the forced injections of medication.

### 1. Fourteenth Amendment Due Process Claim

Dr. Levine, the only individual defendant in this case, did not order that Mr. Cherry receive involuntary injections. Rather, he referred the case to a medical treatment review committee who made that determination. Nonetheless, the Court will discuss whether Mr. Cherry's due process rights under the Fourteenth Amendment were violated by the administration of involuntary medication.

The Supreme Court has discussed the circumstances under which it is lawful for a prison to treat a mentally ill prisoner with antipsychotic drugs against his will. *Washington v. Harper,* 494 U.S. 210 (1990). "[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227. "[T]here is little dispute in the

psychiatric profession that proper use of [antipsychotic medications] is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior." *Id.* at 226.

To satisfy due process in a situation in which a prisoner wants to exercise his right to refuse treatment, three requirements must be satisfied: 1) the State must find that medication is in the prisoner's medical interest (independent of institutional concerns); 2) the panel that reviews a treating physician's decision to prescribe forced medication must make an impartial and independent judgment, taking into account the prisoner's best interest; and 3) the prisoner must be allowed the opportunity to argue before the review panel that he does not need forced medication. *Harper*, 494 U.S. at 222, 227, 233; *see also Fuller v. Dillon*, 236 F.3d 876, 881 (7th Cir. 2001); *Sullivan v. Flannigan,* 8 F.3d 591 (7th Cir. 1993).

The record reflects that each of the *Harper* requirements were satisfied before it was determined that involuntary administration of antipsychotic medication was necessary. Mr. Cherry's treating psychiatrist, Dr. Levine, was of the medical opinion that Mr. Cherry posed a serious risk of harm to himself by refusing food and water. He recommended that Mr. Cherry be reviewed by the IDOC medical treatment review committee. Dr. Levine was present at the hearing but did not vote. Other physicians and a prisoner advocate from the prison's custody staff comprised the committee. Mr. Cherry was present at the first hearing.

The committee members noted that Mr. Cherry was suffering from psychosis and had refused food and fluids for a significant period of time. They noted further that Mr. Cherry already had a compromised immune system. The committee made an independent decision that Mr. Cherry could only be stabilized with involuntary medications. This decision took into account Mr. Cherry's medical needs and his best interest, in accordance with the first two requirements under *Harper*. Mr. Cherry was allowed to express his opinion that he did not need

medicine and that he had a religious right to fast, satisfying the third component under *Harper*. Dkt. 35-2, at p. 343.

Under these circumstances, after Mr. Cherry refused antipsychotic medications, his due process rights under the Fourteenth Amendment were not violated when the involuntary administration of antipsychotic medication was approved.

### 2. Eighth Amendment Claim Against Dr. Levine

The Court has also considered whether Dr. Levine's overall treatment could be viewed as being deliberately indifferent to Mr. Cherry's serious medical needs. The Eighth Amendment to the United States Constitution requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation omitted). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

For purposes of summary judgment, the parties do not dispute the first element, that Mr. Cherry has a serious medical need. He has been diagnosed with bipolar disorder, depression, delusions, a history of self-harm, and he is HIV positive.

The undisputed record reflects that within several days after the involuntary medication was first given on September 18, 2015, Mr. Cherry began to eat and drink. He stated that he felt much better, and he was generally more calm and cooperative. Within about ten days, Mr. Cherry was released from suicide observation. He was allowed to return to general population. He continued to receive the antipsychotic injections every two weeks and was seen regularly by mental health professionals.

In November of 2015, Mr. Cherry showed signs of decompensation, refused to be seen by mental health staff, and cut his left wrist. Mr. Cherry's threats of self-harm, failure to eat, and failure to comply with his treatment plan caused him to be placed on suicide watch several more times during the following months.

A six-month review by the committee was conducted in March 2016. Mr. Cherry was notified of the hearing but chose not to attend. Based on Mr. Cherry's refusal to take medications voluntarily, his threats of suicide, his signs of psychosis, and his additional health risks due to his HIV status, the committee approved the continuation of the involuntary medication.

The undisputed record indicates that Dr. Levine acted in Mr. Cherry's best interests by prescribing an antipsychotic medication. When Mr. Cherry initially refused the medication, Dr. Levine exercised his professional judgment and recommended that he be evaluated by the medical review committee. There is no evidence that Dr. Levine was deliberately indifferent to Mr. Cherry's serious medical needs. To the contrary, if Dr. Levine had not acted as he did, Mr. Cherry could have died. Dr. Levine took steps to provide needed treatment when Mr. Cherry had lost more than 50 pounds in a matter of days from refusing food and water.

"A prisoner may establish deliberate indifference by demonstrating that the treatment he received was blatantly inappropriate." *Pyles,* 771 F.3d at 409 (internal quotation omitted).

"Making that showing is not easy: A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Id.* (internal quotation omitted). Mr. Cherry has not shown that any treatment provided or referred by Dr. Levine was so contrary to accepted professional standards that a jury could infer that it was not based on medical judgment. *See Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008). Rather, Dr. Levine responded reasonably to Mr. Cherry's serious mental health issues.

Mere disagreement with a provider's medical judgment is not enough to prove deliberate indifference. *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010). Even if Mr. Cherry had shown negligence on the part of Dr. Levine, which he has not, that would not be sufficient to demonstrate a violation of the Eighth Amendment. *Petties,* 836 F.3d at 728 ("showing mere negligence is not enough"); *Pyles,* 771 F.3d at 409 ("Something more than negligence or even malpractice is required.").

Dr. Levine is entitled to judgment in his favor on Mr. Cherry's deliberate indifference claim.

### 3.  First Amendment Claim Against Dr. Levine

Mr. Cherry contends that he had told the defendants that he is a Christian and he was fasting in accordance with his First Amendment rights. The Free Exercise Clause of the First Amendment protects an inmate's right to practice his or her religion. To survive summary judgment on a Free Exercise claim, Mr. Cherry must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm,* 809 F.3d 376, 379 (7th Cir. 2016). "A substantial burden put[s] substantial pressure on an adherent to modify his behavior and to violate his

beliefs." *Id.* (internal quotation omitted). "A burden is unjustified if it is not reasonably related to a legitimate penological interest." *Id.* at 380.

Even if the Court assumes for purposes of this motion that "fasting" is a practice of Christianity, Mr. Cherry has presented no evidence showing that being allowed to refuse more than twenty (20) meals consecutively and to the point where it endangered his health, was a practice of his religion. There is also no evidence that prescribing antipsychotic medication, referring Mr. Cherry's case to the medical review committee, or the resulting forced medication constituted substantial burdens on Mr. Cherry's religious practices. Not only is there no showing of a substantial burden, but the actions taken by Dr. Levine were justified. There is evidence in the record which indicates that Mr. Cherry did not comprehend how dangerous his refusal to eat and drink was to his overall well-being. His serious mental illness prevented him from accepting necessary treatment. His dramatic weight loss and lack of hydration created serious health risks. The introduction of forced medication was reasonably related to the need to provide him adequate mental health treatment and to protect Mr. Cherry's safety.

To the extent Mr. Cherry believes there was a substantial burden placed on his religious practices, no reasonable jury could find that such burden was unjustified and was not reasonably related to legitimate interests of keeping Mr. Cherry alive and hydrated. Under these circumstances, Dr. Levine is entitled to summary judgment on Mr. Cherry's First Amendment claim.

### 4. Eighth Amendment Claim Against Corizon

Mr. Cherry alleges that Corizon has a policy and practice of forcing medication when it is unwarranted and does not properly train its medical staff at Pendleton. To establish liability against a corporate entity such as Corizon, a plaintiff must introduce evidence that establishes a

plausible inference that Corizon "maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward v. Correctional Medical Services*, 368 F.3d 917, 927 (7th Cir. 2004). To prove that a Corizon policy rather than the acts of its employees caused the harm, "[e]ither the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Glisson v. Indiana Department of Correction,* No. 15-1419, 2017 WL 680350, *5 (7th Cir. Feb. 21, 2017). The plaintiff must "show that a [Corizon] policy was the 'direct cause' of or 'moving force' behind his constitutional injury." *Pyles,* 771 F.3d at 409-410; *Glisson,* 2017 WL 680350 at *5 ("The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* [*v. New York City Dept. of Soc. Serv.* 436 U.S. 658 (1978)], is exclusive), caused the constitutional deprivation.").

This claim warrants little discussion because Mr. Cherry has presented no evidence of a Corizon policy or practice of forcing unwanted medication when it is not necessary. In his own circumstances, Mr. Cherry was in need of the antipsychotic medication to help prevent serious physical and mental health complications. Dr. Levine was not deliberately indifferent to Mr. Cherry's medical needs, and there is no showing of deficient training. *See City of Canton v. Harris,* 489 U.S. 378, 391 (1989) (plaintiff must prove that a deficiency in training caused deliberate indifference on the part of the individual defendant). In fact, there was an IDOC policy by which an inmate who refused psychotropic treatment could be evaluated. Dkt. 35-3. Dr. Levine followed that policy and acted in Mr. Cherry's best interest when Mr. Cherry put his own health and safety at risk. Without some admissible evidence of an unconstitutional Corizon policy that caused him harm, Mr. Cherry cannot create a genuine issue of fact regarding this

claim. Accordingly, Corizon is entitled to summary judgment on Mr. Cherry's Eighth Amendment policy claim.

### 5.  State Law Breach of Contract Claim

Mr. Cherry's final claim is that Corizon breached its contract with the IDOC by failing to properly train its medical personnel. He alleges that he is a third-party beneficiary of that contract. This claim also fails for lack of evidence. Without discussing the issue of whether Mr. Cherry was intended to be a third-party beneficiary of the contract, the evidence shows that his medical treatment was within the standard of care. Mr. Cherry presents no evidence of what training was deficient or that any "breach" occurred. Corizon is entitled to summary judgment on this claim.

### IV.  Conclusion

In sum, the undisputed facts demonstrate that neither Corizon nor Dr. Levine violated Mr. Cherry's First, Eighth, or Fourteenth Amendment rights. In addition, there was no breach of contract. Accordingly, the defendants are entitled to summary judgment in their favor.

For the reasons set forth above, the defendants' motion for summary judgment [dkt. 34] is **GRANTED.** Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:   ___02/28/2017_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Danny William Cherry, #249323
New Castle Correctional Facility - Psychiatric Unit
Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Electronically registered counsel